Wax v. International Mailers Union, Appellant.

174

Argued November 17, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

M. H. Goldstein, with him Bernard L. Barkan, Michael Brodie, and Goldstein and Barkan, for appellants.

Richard S. Hoffmann, for appellee.

Opinion by Mr. Justice Cohen, June 3, 1960:

This is an appeal from the dismissal by the Court of Common Pleas No. 1 of Philadelphia County of appellants' preliminary objections to appellee's amended complaint in equity. In his amended complaint the appellee, Samuel Wax, who earned his livelihood as a mailer,[1] alleges that he was a member in good standing of the appellant International Mailers Union (International) from 1915 to August 31, 1956; that he was also a member of the appellant Philadelphia

---

[1] The work and duties of a mailer consist, inter alia, of addressing, tagging, stamping, labeling, bundling and wrapping newspapers, magazines, periodicals and the like for transmittal through the U.S. mails; the duties also include the receipt from other states, through the mails and otherwise, of newspapers, magazines, periodicals, and the like, and the sorting, routing, stacking, marking and handling the same for further transportation to points both within and without the Commonwealth.

Mailers Union No. 14 (Union) from 1922 to August 31, 1956; after which he was improperly expelled from both the International and the Union by the president of the International, in accordance with a resolution adopted by the Annual Convention of the International; that as a result of the invalid expulsion and continuously since then, he has been unable to obtain work as a mailer; and that appellee, in seeking relief, has exhausted the internal remedies available to him within said associations. The prayer of the complaint is for reinstatement and damages and for such other relief as the Court deems just and proper. The appellants filed amended preliminary objections, which in part challenge the lower court's jurisdiction to entertain the cause of action. Upon the lower court's dismissal of the objections based on jurisdiction, the instant appeal was taken under the Act of March 5, 1925, P.L. 23, §1, 12 PS §672.

In their preliminary objections, appellants contend that exclusive jurisdiction over the subject matter is vested in the National Labor Relations Board (N.L.R.B.) under the Labor Management Relations Act of 1947 (Taft-Hartley Act), 61 Stat. 136 et seq., 29 U.S.C.A. §141 et seq., on the ground that appellee is in effect charging the appellants with having committed an unfair labor practice; that although the case arises out of a labor dispute, as defined in the Act of June 2, 1937, P. L. 1198, 43 PS §206 (Anti-Injunction Act), the amended complaint does not allege any of the facts which said Act requires a court to find in order to acquire the jurisdiction necessary to grant the injunctive relief sought; and that the president of the International is an indispensable party and that appellee's failure to join him as a party-defendant renders the complaint totally defective. And finally, appellants contend that appellee's allegation of exhaustion of internal remedies in the amended complaint is insufficient.

Although appellants' final contention was raised on demurrer and not as a jurisdictional question, and although it was not passed upon by the lower court, in view of our contemporaneous holding in *Falsetti v. Local No. 2026, United Mine Workers of America*, 400 Pa. 145, 161 A. 2d 882 (1960), we deem it imperative to treat the matter as a jurisdictional question properly raised. There is ample authority for the proposition that once a question of jurisdiction is raised or involved in a proceeding before this Court, the parties may not limit our review to the issue raised and exclude all others which pertain to jurisdiction. *Gardner v. Allegheny County*, 382 Pa. 88, 96, 114 A. 2d 491 (1955); *Jacobs v. Fetzer*, 381 Pa. 262, 112 A. 2d 356 (1955); *Fineman v. Cutler*, 273 Pa. 189, 193, 116 Atl. 819 (1922).

As we stated in *Falsetti*, a plaintiff's mere allegation of exhaustion of remedies will not satisfy the requirement which must be met before our courts, in suits brought by members against their associations, may exercise jurisdiction. In his amended complaint, appellee makes the following cryptic allegation: "11. That the plaintiff has exhausted the remedies available within the INTERNATIONAL MAILERS UNION and the PHILADELPHIA MAILERS UNION NUMBER 14, and that he has no adequate remedy at law." Attached to appellee's amended complaint is Exhibit "A" which is a copy of Article XXI of the International's by-laws, in effect in August, 1956, and from which the president of the International and its Annual Convention purported to derive their authority for appellee's alleged expulsion.[2] Section 2(e) of Article XXI specifically

---

[2] "Criminal Conviction—Revoking Membership

"Section 2. (a) When a member is convicted of the commission of a crime or serious wrongdoing, or pleads guilty to the commission of a crime or serious wrongdoing, against the local union or against

provides an aggrieved member with the right to appeal to named bodies within the International for redress against action taken against him which he deems un-just. Later sections of the Article spell out procedural requirements which must be complied with in taking an appeal, i.e., giving notice in writing of intention to appeal, filing six copies of the grievant's appeal brief, etc. Further, there are provisions in the Article which provide for appeal from an adverse decision of the Executive Council, after notice and filing briefs and documents with the Secretary-Treasurer of the International, to the next succeeding Convention. And finally, there is a provision making the determination of the Convention final. It is thus patently clear from the face of appellee's amended complaint and supporting data that internal union remedies are provided by the International for the resolution of member-association disputes.

the community, and which crime or act of serious wrongdoing tends to bring dishonor upon the local union or the International Organization, it shall be the duty of the Executive Board of the Local Union to proceed to revoke the membership of such member. Likewise, whenever a member of a local union has engaged in what is commonly termed racketeering, and he is found guilty thereof by any Municipal County, State, or Federal Court, thereby bringing dishonor upon the local union or upon the International Organization, it shall be the duty of the local union to proceed in the manner provided in this Article, to revoke the membership of such member.

. . .

"(c) In the event a local union fails to carry out the foregoing provision, then the President of the International Mailers Union, when the matter is brought to his attention, shall have the power, in his discretion, to proceed to revoke or order the revocation of the membership of such member.

. . .

"(e) Any member affected by any decision of a Local Executive Board or the International President under the above provisions shall have the right of appeal to the Executive Council and/or to the next succeeding Convention."

We need only refer to the cogent reasons stated in *Falsetti* why disputes of this nature should initially be channeled through the processes established within the association before resort to the courts. We deem of sufficient importance the interests of the courts and the public in having the grievant utilize the association's internal remedies prior to court adjudication, that even without a blanket denial of exhaustion by the defendant association, we will require a member-plaintiff to plead exhaustion with enough specificity as to clearly indicate that the matter is "ripe" for adjudication. A mere conclusion of the pleader that he has exhausted his internal remedies, without specific averment of the procedure available, the steps taken, or the specific reasons why certain steps were not taken, will be insufficient to support jurisdiction. Such a specific pleading may be considered a jurisdictional statement without which a member may not invoke the aid of our courts.

For this reason alone the order of the court below must be reversed. Because the importance of the jurisdictional statement may not have been self-evident prior to *Falsetti,* however, we point to an equally important reason why the lower court's jurisdiction cannot be sustained.

Appellee was employed in an industry that affects interstate commerce. This is so because all of the employers by whom mailers are employed are so engaged, and because the work done by mailers has a substantial effect on interstate commerce. See *Superior Court of Washington for King County v. Washington ex rel. Yellow Cab Service, Inc.,* 361 U.S. 373, 4 L. Ed. 2d 380 (1960), reversing per curiam 53 Wash. 2d 644, 333 P. 2d 924 (1959). As a result, some of the aspects of the relationship between appellee and the labor organization of which he is a member are sub-

ject, because of the Taft-Hartley Act, to the exclusive jurisdiction of the N.L.R.B.

Section 8(b)(2), 29 U.S.C.A. §158(b)(2), of the Taft-Hartley Act provides that it shall be an unfair labor practice for a labor organization or its agents: "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." Section 8(a)(3) makes it an unfair labor practice for an employer: "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ." Section 10(a) of the same Act, 29 U.S.C.A. §160(a), gives the N.L.R.B. the jurisdiction and power to prevent such unfair labor practices in industries affecting interstate commerce. And finally, section 10(c), 29 U.S.C.A. §160(c), empowers the Board in such cases to grant a certain measure of relief. Our problem is whether the instant situation falls within the rule that "when an activity is *arguably subject* to §7 or §8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (Emphasis supplied). *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), citing *Garner v. Teamsters C. & H. Local Union,* 346 U.S. 485, 74 S. Ct. 161, 98 L. Ed. 228 (1953) and *Weber v. Anheuser-Busch, Inc.,* 348 U.S. 468, 75 S. Ct. 480, 99 L. Ed. 546 (1955).

To sustain the jurisdiction of a state tribunal in this matter, both the appellee and the court below erroneously relied upon *International Association of Machinists et al. v. Gonzales,* 356 U.S. 617, 78 S. Ct. 923, 2 L. Ed. 2d 1018 (1958). In that case the Supreme Court sustained the jurisdiction of a state court which had ordered reinstatement of a plaintiff who had alleged a wrongful expulsion from his union. We think that the *Gonzales* situation is clearly distinguishable from the instant case. Moreover, the Supreme Court's recent ruling in the second *Garmon* case has either effectively undercut or severely limited to its facts the *Gonzales* case.

In the matter now before us, the appellee seeks reinstatement only because, as he alleges, the direct result of the expulsion has been to prevent him from continuing work as a mailer. He makes no claim for damages based on injury to his *rights as a member* of the appellant unions, which in a proper case, as we stated in *Falsetti,* our courts will protect. Therefore, the crux of the appellee's case is not injury to the *union-member* relationship, as it was in *Gonzales,* but rather injury to appellee's *employment* relationship by reason of the appellant's arbitrary and unreasonable action in expelling him. Since appellee has not provided any explanation of how or why the expulsion from appellant unions has prevented him from obtaining work as a mailer, we can only infer that in pursuance of agreements or arrangements between employers and the appellants, only members of the appellant unions could obtain work from the employers, and further, that as a consequence thereof, that appellants from August, 1956, on, caused the employers to refuse employment to the appellee because he had lost his membership in appellant unions. The theory of appellee's cause of action, therefore, if substantiated by the evidence, makes it at least arguable

if not more, that the type of union activity involved was in violation of Section 8(b)(2) of the Taft-Hartley Act and thus subject to the N.L.R.B.'s exclusive jurisdiction.

In *Gonzales*, on the other hand, the plaintiff claimed injury to his union-member relationship and it was on that theory that the case was pleaded and tried. As Justice FRANKFURTER stated at the outset of his opinion, "the crux of the claim sustained by the California court was that under California law membership in a labor union constitutes a contract between the member and the union, the terms of which are governed by the constitution and by-laws of the union, and that state law provides, through mandatory reinstatement and damages, a remedy for breach of such contract through wrongful expulsion." 356 U. S. at 618. The court ordered the plaintiff reinstated to membership and awarded damages both for the physical and mental suffering which the breach of contract had brought about, and for lost wages similarly caused. On plaintiff's own theory of the case, the fact that he was unable to obtain employment was only an incidental effect of the breach of contract, developed as an item of damage through evidence adduced at the trial. It is belaboring the obvious to point out that the theories behind the two suits are entirely distinct. In sustaining the state court's jurisdiction, the court emphatically pointed out that "the protection of union members *in their rights as members* from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied." Id. at 620. (Emphasis supplied). And again at pp. 621-622, the Court reiterated "that the subject matter of the litigation in the present case, as the parties and the court conceived it, was the breach of a *contract governing*

*the relations between respondent and his unions.*"[3] (Emphasis supplied). We conclude, therefore, that even if *Gonzales* remains unimpaired by the Supreme Court's later holding in the second *Garmon* case, our jurisdiction can only be sustained where the complaint is grounded solely on injury to the plaintiff's member-union relationship, and which complaint does not seek damages for "back pay" as a result of interference by the union with employment rights, which remedy the N.L.R.B. is specifically empowered by Section 10(c) to grant in unfair labor practices cases.

Above and beyond the reasons already given, we think that the rationale underlying the *Gonzales* decision has been almost entirely obliterated by the subsequent holding in the second *Garmon* case. As Chief Justice WARREN, dissenting in *Gonzales,* stated, "By sustaining a state court damage award against a labor

---

[3] Justice FRANKFURTER at this point included the following quotation from the California Supreme Court's opinion which further sharpens the factual distinctions between the case at bar and the *Gonzales* situation: "* 'In determining the question of whether the exclusive jurisdiction to grant damages in a case of this kind lies in the Labor Relations Board, *it is first necessary to determine the character of the pleadings and issues in this case. The petition alleged a breach of contract between the union and plaintiff, one of its members. . . .* It took the form of a petition for writ of mandate because damages alone would not be adequate to restore to petitioner the things of value he had lost by reason of the breach. *No charge of 'unfair labor practices' appears in the petition.* The answer to the petition denied its allegations and challenged the jurisdiction of the court, but said nothing about unfair labor practices. *The evidence adduced at the trial showed that plaintiff, because of his loss of membership, was unable to obtain employment and was thereby damaged. However, this damage was not charged nor treated as the result of an unfair labor practice but as a result of the breach of contract. Thus the question of unfair labor practice was not raised nor was any finding on the subject requested of, or made by, the court.'* 142 Cal. App. 2d 207, 217, 298 P. 2d 92, 99." Id. at 622, * (Emphasis supplied)

organization for conduct that was subject to an unfair labor practice proceeding under the Federal Act, this Court sanctions a duplication and conflict of remedies to which I cannot assent. Such a disposition is contrary to the unanimous decision of this Court in Garner v. Teamsters C. & H. Local Union. . . . [356 U. S. at 623]. . . . In a pre-emption case decided upon what now seem to be discarded principles, the author of today's majority opinion declared: 'Controlling and therefore superseding federal power cannot be curtailed by the State even though the ground of intervention be different than that on which federal supremacy has been exercised.' Weber v. Anheuser-Busch, Inc., supra (348 U. S. at 480). I would adhere to the view of pre-emption expressed by that case and by Garner v. Teamsters, C. & H. Local Union. . . ." 356 U. S. at 632-33. Justice FRANKFURTER, the author of *Weber, Gonzales* and now the second *Garmon* case, makes it abundantly clear in the latter decision that the "discarded principles" embodied in *Garner* and *Weber* have been completely restored as guiding lights in the Court's continuing attempts to fill in the "Delphic" interstices of the Taft-Hartley Act. In the *Garmon* decision, Justice FRANKFURTER dismisses the *Gonzales* decision as one involving a situation "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act" (359 U. S. at 243), thereby indicating clearly that *Gonzales* at most will be limited to its facts. Nor is there any doubt that the prophetic remark of Justice HARLAN, who concurred in the result, that the *Garmon* case "will stand as a landmark in future 'pre-emption' cases in the labor field" (359 U. S. at 250) will be borne out. See the *Yellow Cab Service, Inc.* decision, supra, wherein the Court, *without opinion* and citing only the *Garmon* case, summarily reversed a pre-emption case wherein the only issue argued was whether

there had been enough of an effect on interstate commerce as to oust state court jurisdiction.

Besides quoting extensively from the *Weber* and *Garner* decisions, the Court in *Garmon* had this to say, ". . . in the course of a process of tentative, fragmentary illumination carried on over more than a decade during which the writers of opinions almost inevitably, because unconsciously, focus their primary attention on the facts of particular situations, language may have been used or views implied which do not completely harmonize with the clear pattern which the decisions have evolved. . . . [359 U. S. at 241]. . . . In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. . . . [359 U. S. at 241-42]. . . . We have necessarily been concerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal and the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency armed with its own procedures, and equipped with its specialized knowledge and cumulative experience. . . . [359 U. S. at 242] . . . judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. . . . [359 U. S. at 243]. . . . At times it has not been clear whether the particular activity regulated by the States was governed by §7 or §8 or was, perhaps, outside both these sections. But *courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be*

*left in the first instance to the National Labor Relations Board. . . .* [Emphasis supplied—359 U. S. at 244-45]. . . . The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy. . . ." 359 U. S. at 246.

We read the *Garmon* decision as Justice HARLAN reads it. Out of the intricate maze of prior opinions, their distinguishing characteristics and their attending confusion both to the bench and bar, the Supreme Court in one landmark case has created order. We can add nothing to the language used by Justice FRANKFURTER in so doing. He has directed attention to the significant criteria by which both the state and federal judiciary must determine whether jurisdiction exists in these labor situations. We are to be concerned solely with delimiting the areas of potential conflict between the two law-enforcing authorities, and in so doing, we should focus on the nature of the activities rather than on the method of regulation. The unifying consideration should always be that Congress has entrusted responsibility in this area to an administrative agency, the N.L.R.B., equipped with specialized procedures and peculiar expertise, to which body primary determinations of jurisdiction should be referred in order to effectuate the intent of Congress, in the Taft-Hartley Act, to fashion a national labor policy. The test given us by the Supreme Court to apply is not at all complex. Is the activity *arguably* within §7 or §8? If it is, then the jurisdiction of state and federal courts is ousted. Only a subsequent determination by the N.L.R.B. that the activity is neither protected nor prohibited can vest jurisdiction once again in our courts.

In the instant case, the potential danger of conflict with federal authority is omnipresent. The alleged

union activity would, if proved, be arguably subject to a §8 proceeding. The appellee's complaint in effect charges that without the necessary union clearance, employers could not accept the appellee as an employee. The result was to encourage membership in the union on the union's own terms. As the Supreme Court has stated, "§§8(a)(3) and 8(b)(2) were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." *Radio Officers' Union v. N.L.R.B.,* 347 U. S. 17, 40, 74 S. Ct. 323, 98 L. Ed. 455 (1954). And even the proviso to §8(a)(3), which authorizes certain union security contracts, prohibits discharge under such contracts if union membership was terminated for reasons other than the failure to pay dues. Cf. *N.L.R.B. v. Oklahoma City Gen. Driv.,* 235 F. 2d 105 (10 Cir. 1956). Nor is the fact that the N.L.R.B. may not order appellee's reinstatement in appellant unions, as prayed for in the complaint, sufficient in and of itself to sustain state jurisdiction. A conflict of remedial schemes can be as injurious to a national labor policy as a conflict in results which depend upon which system is invoked.

In any case, the primary determination of jurisdiction in this matter should be left to the N.L.R.B. The case meets the *Garmon* test of being arguably subject to §7 or §8. We therefore hold that the jurisdiction of the Pennsylvania state courts has been ousted by federal pre-emption under the Taft-Hartley Act.

Order of the court below reversed with costs on appellee.

Mr. Justice BELL and Mr. Justice BENJAMIN R. JONES dissent.